# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DOUGLAS M. DEWAR, )
)
        Respondent, )
)
        v. )
)
KENNETH SMITH and JANE DOE )
SMITH, husband and wife, and )
the marital community composed )
thereof; TRANER SMITH & CO. )
PLLC, a Washington professional )
limited liability company, )
)
        Petitioners. )
_____ )

No. 69701-3-I
(consolidated with
No. 70190-8-I)

DIVISION ONE

PUBLISHED OPINION

FILED: January 26, 2015

      LEACH, J. — On discretionary review, we consider the extent of an accountant's duty to a third party. Certified public accountant (CPA) Kenneth Smith and the accounting firm Traner Smith & Company PLLC (collectively Smith) challenge the trial court's summary award of a $1,375,930.86 judgment to Douglas Dewar for Smith's alleged negligent misrepresentations about a client's tax return and related activities. Smith also challenges the denial of his request for summary judgment on contract claims. Dewar asks this court to allow him to supplement the record with information not considered by the trial court.

      We agree that Smith breached a duty he owed to Dewar. But Dewar has not established as a matter of law that Smith's negligent misrepresentation

proximately caused his damages, and disputed issues of material fact preclude summary judgment on the remaining issues considered by the trial court. We deny Dewar's motion to supplement the record. We reverse and remand for further proceedings consistent with this opinion.

## FACTS

Bradley Beddall, a real estate developer, and Dewar, Beddall's financier and accountant, participated over the years in many real estate joint ventures. Around 2006, Dewar and Beddall began a condominium conversion project for the Lea Hill Condominiums. The details of the documentation of their respective obligations and the associated entities they used for the project are not important to our analysis. Therefore, we will describe all transactions and documents as taking place directly between Dewar and Beddall.

By 2009, the local real estate market had declined, the project had floundered, Beddall owed to Dewar about $3,900,000, and Beddall could no longer meet his obligations. In July 2009, Beddall told Dewar that he wanted out of the project and all associated obligations that he owed Dewar. Dewar would not release Beddall. In late 2009, Dewar sued Beddall for breach of loan documents. The parties then discussed settlement for several months.

In January 2010, Beddall signed a quit claim deed conveying the Lea Hill property to Dewar. This deed stated it was effective December 29, 2009, and preserved Beddall's liability to Dewar. In March 2010, Dewar and Beddall signed a settlement agreement, also having a stated effective date of December 29, 2009. Beddall's attorney, Jonathan Hatch, also signed the agreement and agreed to be bound by it. Critical to the agreement was Dewar's belief that Beddall could obtain a large tax refund based upon his losses from the project.

As a result, the agreement required that Beddall transfer title to the Lea Hill property, which generated losses, to Dewar and hire the accounting firm of Traner Smith to timely file Beddall's 2009 tax return, seeking a refund of not less than $1,000,000. The agreement gave Dewar the right of "review, evaluation, and approval" of the tax return in his "sole and absolute discretion." Beddall "irrevocably and permanently" assigned the tax refund to Dewar. The agreement contained provisions intended to ensure Dewar's receipt of the tax refund, which the Internal Revenue Service (IRS) would issue in Beddall's name.

Beddall signed an "irrevocable" power of attorney and appropriate IRS Form 2848 authorizing attorney Hatch to sign the tax return, receive and negotiate the refund check, and deliver the funds to Dewar. Hatch agreed to sign

and file the return after Dewar approved it. He also agreed to deliver all refund proceeds to Dewar.

Smith was not a party to the settlement agreement and did not sign it. Smith's engagement letter to Beddall does not mention Dewar. But Kenneth Smith knew the content of the settlement agreement and its purpose. During his preparation of Beddall's tax return, Smith had a copy of the agreement. Consistent with the Hatch-Beddall power of attorney and IRS forms, Smith prepared the return for Hatch's signature.

On April 15, 2010, Hatch signed the completed tax return, which had Beddall's address on it. As the settlement agreement required, Smith transmitted the return to Dewar for his review. The same day, Dewar notified Smith that the return contained three errors: the omission of Beddall's foreign bank accounts, a missing entry for Beddall's sale of an apartment house, and the return address, which the settlement agreement required to be Hatch's, not Beddall's. Dewar concluded, "The only change I insist on is the address change."[1] After Smith changed the address, Hatch returned to Smith's office to sign the amended return, which Smith filed the same day.

---

[1] In an e-mail earlier that day, in which he asked about the tax return, Dewar instructed Smith, "Be sure to use Hatch's address."

Shortly after Smith filed the return, Beddall instructed him to stop discussing the matter with Hatch and to communicate about the return only with Beddall. In May 2010, after Beddall asked about the status of the refund, Smith placed a conference call between Beddall, Smith, and an IRS representative via an IRS practitioner's hotline. During the call, Beddall asked the IRS representative to change the address on his tax return from Hatch's address to Smith's address. This changed the address to which the IRS would send any refund from Hatch's to Smith's. Smith was on the line but did not participate in the conversation.

In early June, Dewar learned that he could no longer access Beddall's tax return online. He sent an e-mail to Hatch, with a copy to Smith, asking Hatch to confirm with Smith Dewar's right to review the tax return. Dewar also asked that Hatch or Smith contact the IRS about the status of the refund. In response, Smith forwarded to Dewar a copy of the original tax return with Hatch's address. Smith did not tell Dewar or Hatch that Beddall had amended the address on the return or in any manner indicate that the copy he provided was not currently correct in all aspects. From both the settlement agreement and the events of April 15, Smith knew about the importance of the return address to Dewar.

In July 2010, the IRS sent four refund checks totaling $1,206,703.32 to Smith's office. Smith notified Beddall, who instructed him to deliver the checks to Beddall's son-in-law, Ron Rubin. Smith did so.

On August 16, 2010, Beddall sent an e-mail to Dewar and Hatch. He stated that he had the tax refund money in Thailand, offered to pay Dewar $500,000 "right now," and offered to "set up an account with $200,000 for future/current legal costs or judgments." Beddall forwarded this e-mail to Smith and also called Jonathan Hatch that day. Smith withdrew from his engagement with Beddall.

Dewar sued Traner Smith and Kenneth Smith for conversion, civil conspiracy, tortious interference with contractual relationship, breach of implied contract, breach of duty owed to third-party beneficiary, breach of fiduciary duties, and violation of the Consumer Protection Act, chapter 19.86 RCW. On November 9, 2012, the trial court granted Dewar's motion for partial summary judgment to establish that Smith owed Dewar a duty of care. The court also concluded that Smith committed negligent misrepresentation when the address on the tax return was changed, he received the checks, and he gave them to Rubin without disclosing these actions to Dewar and Hatch. On the same day,

the trial court denied Smith's motion for partial summary judgment to dismiss contract claims. Smith filed a motion for discretionary review in this court.

On March 21, 2013, the trial court granted Dewar's motion for partial summary judgment as to Dewar's damages caused by Smith's negligent misrepresentation. The court concluded that Dewar "has been damaged as a direct, undisputed, proximate cause of [Smith's] negligent misrepresentation in the principal amount of $1,375,930.86."[2] Smith again petitioned this court for discretionary review. On May 23, 2013, the trial court struck the parties' trial date pending appellate review. On the same day, Dewar voluntarily dismissed some remaining claims without prejudice.

On August 2, 2013, a commissioner of this court granted discretionary review, consolidating Smith's two petitions. On January 30, 2014, Dewar filed a motion to supplement the record with a January 2014 stipulation and agreed order between Kenneth Smith and the Board of Accountancy in disciplinary proceedings.

---

[2] In the same order, the court denied without prejudice Dewar's motion for entry of a final judgment under CR 54(b).

STANDARD OF REVIEW

This court reviews a partial summary judgment order de novo, engaging in the same inquiry as the trial court.[3] It considers the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.[4] Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[5]

ANALYSIS

Federal Preemption

Smith contends that federal law preempts the trial court's decision because federal statutes prohibit him from making any disclosures about Beddall's tax return without Beddall's express consent. To support this contention, Smith cites 26 U.S.C. § 6713(a) (1989), which imposes penalties on a tax return preparer who "(1) discloses any information furnished to him for, or in connection with, the preparation of any such return, or (2) uses any such information for any purpose other than to prepare, or assist in preparing, any

---

[3] Macias v. Saberhagen Holdings, Inc., 175 Wn.2d 402, 407, 282 P.3d 1069 (2012); Woo v. Fireman's Fund Ins. Co., 161 Wn.2d 43, 52, 164 P.3d 454 (2007).
[4] Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 922, 296 P.3d 860 (2013).
[5] CR 56(c).

such return." Similarly, 26 U.S.C. § 7216(a) (1989) provides that a tax return preparer who "knowingly or recklessly" discloses or uses tax return information "shall be guilty of a misdemeanor" and subject to criminal penalties. Smith points out that federal law defines "tax return information" as "including, but not limited to, a taxpayer's name, address, or identifying number, which is furnished in any form or manner for, or in connection with, the preparation of a tax return of the taxpayer."[6]

Dewar responds that Smith knew about the property settlement agreement and, with Beddall's consent, gave opinions and freely shared information among Beddall, Dewar, and Hatch as contemplated by the agreement. This included Smith's transmission of the completed tax return to Dewar for his prefiling review and approval. Dewar argues that Smith should not be able to "waive the confidential relationship when they so desire and as contemplated by the contract" and then later "use it as a sword in their defense of what they in fact did." Smith responds that by the time Dewar inquired about the status of the refund and requested a copy of Beddall's tax return, Beddall had instructed him (Smith) not to discuss the tax return with anyone but Beddall. Therefore, Smith was no longer authorized to disclose any of Beddall's tax return information.

---

[6] Treas. Reg. § 301.7216-1(b)(3)(i) (2008).

We agree with Smith that once Beddall revoked his consent, federal law prohibited Smith from disclosing confidential tax information, including addresses.[7] This federal prohibition preempts any state law tort duty to disclose. But when Dewar requested a copy of Beddall's return, Smith had choices besides disclosing taxpayer information in violation of federal law or transmitting the misleading original return. He could have requested Beddall's consent to share the amended return. If, as expected, Beddall refused, Smith could have told Dewar that he couldn't share any further information because Beddall had revoked his consent to disclosure. As Dewar noted at oral argument, Smith could also have made a "noisy withdrawal" of representation after Beddall changed the return address. Neither response would convey to Dewar the false assurance that the return still contained Hatch's address, and neither would have violated any legal or professional requirements. Smith's federal preemption argument fails because federal law did not require him to make the misleading response he provided.

---

[7] 26 U.S.C. § 7216(a); Treas. Reg. § 301.7216-1(b)(3)(i); WAC 4-30-050(3) (Accountants "must not without the specific consent of the client or the heirs, successors, or authorized representatives of the client disclose any confidential communication or information pertaining to the client obtained in the course of performing professional services.").

No. 69701-3-I (consol.
with No. 70190-8-I) / 11

## The Duty of Care and Trask v. Butler[8]

Smith challenges the trial court's decision that Smith owed Dewar a duty. He argues that neither statutory nor common law, including our Supreme Court's decision in Trask v. Butler, establishes any accountant's duty to third parties.

Federal and state laws and regulations, as well as the American Institute of Certified Public Accountants Code of Professional Conduct (AICPA Code), define the duties of certified public accountants.[9] The AICPA Code states that accountant members have the obligation to serve the public interest[10] and "should perform all professional responsibilities with the highest sense of integrity," which "can accommodate the inadvertent error and the honest difference of opinion [but] cannot accommodate deceit or subordination of principle." "Integrity also requires a member to observe the principles of objectivity and independence and of due care."[11] Washington laws regulating accountancy also emphasize the policy and purpose of protecting the public interest.[12] In the context of financial statements and records, a CPA violates the

---

[8] 123 Wn.2d 835, 872 P.2d 1080 (1994).

[9] See WAC 4-30-048, recognizing AICPA as an "[a]uthoritative bod[y]" governing CPAs; http://www.aicpa.org/Research/Standards/CodeofConduct/ DownloadableDocuments/2009CodeofProfessionalConduct.pdf. This link is to the June 1, 2009, version of the code, which is the version in force at the time of most of the events described here.

[10] AICPA CODE OF PROFESSIONAL CONDUCT ET § 53 (art. II).

[11] AICPA CODE OF PROFESSIONAL CONDUCT ET § 54 (art. III).

[12] RCW 18.04.015(b).

-11-

code of conduct by making or permitting a transmission of "materially false and misleading information."[13]

The AICPA Code and Treasury Department Circular No. 230 also prohibit a practitioner, including a CPA, from representing a client before the IRS if that representation would involve a conflict of interest. Circular 230 defines a conflict of interest as a situation where "[t]here is a significant risk that the representation . . . will be materially limited by the practitioner's responsibilities to another client, a former client or a third person, or by a personal interest of the practitioner."[14]  Under state and federal law, CPAs also have a duty of confidentiality.[15]

A CPA may rely in good faith on information furnished by the client.[16]  A tax preparer "may not, however, ignore the implications of information furnished to, or actually known by, the practitioner, and must make reasonable inquiries if

---

[13] AICPA CODE OF PROFESSIONAL CONDUCT ET § 102.02 (102-1).

[14] 31 C.F.R. § 10.29(a)(2) (2007).  This section also appears in Circular 230 § 10.29(a)(2).  A practitioner may represent a client despite a conflict of interest if the practitioner reasonably believes that he or she will be able to represent both clients, the representation is not prohibited by law, and both clients expressly waive the conflict and give informed consent in writing at the time the existence of the conflict is known.  31 C.F.R. § 10.29(b); see also WAC 4-30-040; AICPA CODE OF PROFESSIONAL CONDUCT ET § 102.03 (102-2).

[15] 26 U.S.C. §§ 7216(a), 6713; 26 C.F.R. § 301.7216-3(a) (2008); WAC 4-30-050(3).

[16] 31 C.F.R. § 10.34(d) (2007); Treasury Department Circular No. 230 § 10.34(d).

the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete."[17]

Washington courts have imposed a duty of care to third parties on several classes of professionals. In ESCA Corp. v. KPMG Peat Marwick,[18] our Supreme Court identified circumstances where accountants had this duty. ESCA hired accounting firm KPMG to perform audits and prepare financial statements in support of ESCA's application for loans and a line of credit.[19] These financial statements mischaracterized ESCA's financial health, and the lending bank sustained substantial losses when ESCA could not repay the loans.[20] The bank sued KPMG for negligent representation.[21] Our Supreme Court held that the third-party bank could sue KPMG for negligent misrepresentation where the bank justifiably relied on KPMG's representations and audit information to make its business decisions.[22]

Our Supreme Court imposed a similar duty on an engineering firm. In Donatelli v. D.R. Strong Consulting Engineers, Inc.,[23] a developer brought a negligent misrepresentation claim against an engineering firm after delays and

---

[17] 31 C.F.R. § 10.34(d); Treasury Department Circular No. 230 § 10.34(d).
[18] 135 Wn.2d 820, 959 P.2d 651 (1998).
[19] ESCA, 135 Wn.2d at 823-24.
[20] ESCA, 135 Wn.2d at 825.
[21] ESCA, 135 Wn.2d at 825.
[22] ESCA, 135 Wn.2d at 828.
[23] 179 Wn.2d 84, 86-87, 312 P.3d 620 (2013).

cost overruns contributed to the developer's loss of the property in foreclosure. The court held that the engineering firm had a duty arising independently of its client contract to avoid negligent misrepresentations. Therefore, the developers could assert tort as well as contract claims.[24]

These statutes, rules, and Washington cases involving a professional's duty support the trial court's conclusion that Smith owed Dewar a duty of care. Smith had a statutory and common law duty of care to act in the public interest. And because he knew the relevant terms of the settlement agreement, he knew Beddall intended Smith's professional services and the resultant tax refund to benefit Dewar. From Dewar's critique of the original return, Smith knew the importance to Dewar of the taxpayer address shown on the return. This knowledge gave Smith a responsibility to a third person, Dewar, not to mislead him about the return. Given the settlement agreement provisions for the sharing of taxpayer information between Smith and nonclient Dewar and the history of Smith's compliance with those provisions, Dewar justifiably relied on the accuracy of Smith's later representations. As in ESCA and Donatelli, Smith owed a professional duty to avoid misrepresentations to third-party Dewar.

Smith attempts to distinguish ESCA because it involved financial statements intended for review by third parties, not confidential tax information.

---

[24] Donatelli, 179 Wn.2d at 98.

-14-

But Smith offers no persuasive reason to distinguish between misleading financial statements and misleading taxpayer information provided to a third party.

Our Supreme Court has also imposed a duty of care to certain third parties on attorneys. In Trask v. Butler, the court adopted a multifactor balancing test to determine when an attorney owes a duty of care to a nonclient. Under this test, a court must consider:

1.  the extent to which the transaction was intended to benefit the plaintiff;

2.  the foreseeability of harm to the plaintiff;

3.  the degree of certainty that the plaintiff suffered injury;

4.  the closeness of the connection between the defendant's conduct and the injury;

5.  the policy of preventing future harm; and

6.  the extent to which the profession would be unduly burdened by a finding of liability.[25]

The first factor presents the threshold inquiry. If the attorney's client did not intend the representation to benefit a nonclient, that nonclient has no standing to sue.[26]

---

[25] Trask, 123 Wn.2d at 843.
[26] Trask, 123 Wn.2d at 842-43.

Here, the trial court accepted Dewar's position that Trask supports the conclusion that Smith owed a duty to Dewar. Smith argues that the trial court improperly extended Trask to establish an accountant's duty of care to third parties. He contends that Dewar "failed to present any authority or evidence for the application of the Trask multi-factor test to CPAs and Traner Smith."

Although Washington courts have not applied the Trask analysis to CPAs, courts in other jurisdictions have done so. In Glenn K. Jackson, Inc. v. Roe,[27] the Ninth Circuit addressed a legal auditor's duty of care using a similar multifactor test. Surveying cases, the court in Glenn K. Jackson noted an "objective standard that looks to the specific circumstances to ascertain whether a supplier of information has undertaken to inform and guide a third party with respect to an identified transaction or type of transaction. If such a specific undertaking has been made, liability is imposed on the supplier."[28] And courts in Illinois, whose third-party beneficiary test our Supreme Court followed to create the Trask factors,[29] have explicitly held that an accountant may be liable to nonclient third parties when "'the purpose and intent of the accountant-client relationship was to benefit or influence the third-party plaintiff.'"[30]

---

[27] 273 F.3d 1192, 1195 (9th Cir. 2001).
[28] Glenn K. Jackson, 273 F.3d at 1200 n.3.
[29] Trask, 123 Wn.2d at 840, 842.
[30] Builders Bank v. Barry Finkel & Assocs., 339 Ill. App. 3d 1, 8, 790 N.E.2d 30, 273 Ill. Dec. 888 (2003) (quoting Brumley v. Touche, Ross & Co., 139

Application of the Trask factors to this case supports our conclusion that Smith owed Dewar a duty as a third party. First, Beddall and Dewar expressly intended the tax return prepared by Smith to benefit Dewar. Second, Smith knew of the settlement agreement, which required Smith's employment. He had complied with the disclosure and review provisions of the settlement agreement. He knew or should have known that Beddall's address change on the return conflicted with his agreement with Dewar. The harm—diversion of the refund from Hatch, who agreed to deliver the refund proceeds to Dewar—was foreseeable. Third, in losing the benefit of his bargain, Dewar claims to have suffered injury. Fourth, because of Smith's action, Dewar remained ignorant of the changed address. He did not receive inquiry notice of a need to act to protect his interests before Beddall took possession of the refund checks. Therefore, a close connection exists between Smith's conduct and Dewar's claimed harm. Fifth and sixth, a policy to prevent future harm would support enforcing the duty of care that the AICPA Code, Washington case law, and state

---

Ill. App. 3d 831, 836, 487 N.E.2d 641, 93 Ill. Dec. 816 (1985)); see also Kopka v. Kamensky, 354 Ill. App. 3d 930, 935, 821 N.E.2d 719, 290 Ill. Dec. 407 (2004); 225 ILL. COMP. STAT. 450/30.1 (2004) (under Illinois Public Accounting Act, accountant may be held liable to third party when accountant is "aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action").

and federal law and regulations already impose on public accountants. Thus, imposing a duty would not unduly burden the accounting profession.

Smith emphasizes that he was not a party to the Dewar-Beddall settlement agreement and that his engagement letter with Beddall did not incorporate the agreement. In a statement of additional authorities, Smith cites two recent cases in support of his position, Stewart Title Guaranty Co. v. Sterling Savings Bank[31] and Clark County Fire District No. 5 v. Bullivant Houser Bailey P.C.[32]

In Stewart Title, our Supreme Court held that neither the attorney nor the client intended the plaintiff title insurance company to be a beneficiary of an attorney-client contract created when the insurance company hired an attorney to defend its insured-client.[33] As a result, the title company could not satisfy the threshold first element of the Trask test. The court also held that an attorney's limited duty to inform a nonclient third-party payer does not give rise to a broad duty of care that would support a malpractice claim.[34] Similarly, in Clark County Fire District No. 5, Division Two held that the district and the attorney hired by the

---

[31] 178 Wn.2d 561, 311 P.3d 1 (2013).
[32] 180 Wn. App. 689, 324 P.3d 743, review denied, 181 Wn.2d 1008 (2014).
[33] Stewart Title, 178 Wn.2d at 567.
[34] Stewart Title, 178 Wn.2d at 569.

district's insurance company to defend the district did not intend the resulting legal representation of the fire district to benefit the insurer.[35]

These cases are inapposite. In Stewart Title and Clark County Fire District No. 5, an insurance company hired an attorney to defend its insured and paid for that attorney, as presumably required by an underlying insurance policy. In contrast, Dewar had no preexisting obligation to provide accounting services for Beddall and was not a third-party payer who hired Smith to provide those services to Beddall. The settlement agreement required that Beddall hire Smith to prepare a tax return producing the tax refund that Beddall transferred to Dewar in the same agreement. Smith knew the agreement's material provisions. Thus, he knew that Dewar and Beddall intended that Smith's engagement would benefit Dewar. By including Dewar in the preparation and review of the tax return and later providing a copy of a tax return, Smith supplied information "to inform and guide a third party with respect to an identified transaction."[36] We affirm the trial court's conclusion that Smith owed Dewar a duty of care.

Negligent Misrepresentation

The trial court also concluded that Smith breached the duty he owed to Dewar:

---

[35] Clark County Fire District No. 5, 180 Wn. App. at 694.
[36] Glenn K. Jackson, 273 F.3d at 1200 n.3.

> The Court concludes as a matter of law that the Defendants in changing the address for which the Beddall 2009 tax return was to go from the offices of Edmonds attorney Jonathan Hatch to the Defendants' own office and further transmitting those checks to the taxpayer Brad Beddall's son-in-law and failing to disclose to Plaintiff and Jonathan Hatch the change of address, the receipt of the tax refunds, and the turning over of the tax refunds to Beddall's son-in-law is a negligent misrepresentation as a matter of law.

Smith contends that Dewar failed to establish all the elements of negligent misrepresentation, specifically challenging the trial court's decision about proximate cause and damages.

To prove negligent misrepresentation, a party must establish by clear, cogent, and convincing evidence that (1) the defendant supplied information that was false for the guidance of the plaintiff in a business transaction, (2) the defendant knew or should have known that the information was for the purpose of guiding the plaintiff in a business transaction, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.[37]

Smith claims that he cannot have committed misrepresentation by "silence" because "[w]here there is no duty to disclose, there can be no misrepresentation." But Dewar does not rely on Smith's "silence" to establish his

---

[37] Donatelli, 179 Wn.2d at 95 n.3; RESTATEMENT (SECOND) OF TORTS § 552 (1977).

-20-

claim. Rather, the core of Dewar's claim is an undisputed fact not mentioned in the trial court's order: Smith's knowing transmission of a misleading version of Beddall's tax return. At oral argument, Smith maintained that he fulfilled any duty he owed Dewar by securing Beddall's specific permission to disclose exactly what Dewar requested: the tax return Smith had originally prepared for Beddall. This assertion does not persuade us.

A supplier of information for the guidance of others must refrain not only from misrepresenting facts but also from communicating accurate information in a way that misleads.[38] Beddall's limited consent did not give Smith freedom to mislead Dewar; it only limited the ways he could avoid misleading him.

The record contains undisputed evidence that establishes the breach of duty and reliance elements of negligent misrepresentation. First, Smith supplied the misleading tax return for Dewar's guidance in business. Second, Smith knew the material terms of the settlement agreement and knew or should have known that the tax return would guide Dewar in business decisions related to the settlement agreement. Third, Smith conveyed the tax return under circumstances he knew to be misleading. Fourth, Dewar relied on this misleading information, remained ignorant of Beddall's breach of the agreement, and so did not act to protect his own interests. Fifth, given the history of open

---

[38] RESTATEMENT (SECOND) OF TORTS § 552 cmt. f.

communication about the return among all parties, Dewar reasonably relied on the information Smith provided.

However, Dewar does not establish as a matter of law the sixth element, proximate causation between Smith's misrepresentation and his injury. "Proximate cause has two elements: cause in fact and legal causation."[39] "Cause in fact" is the actual, "but for," cause of the injury.[40] "Legal causation" focuses on whether, as a matter of policy, the connection between the ultimate result and the tortfeasor's act is too remote or attenuated to impose liability.[41] The court may determine proximate cause as a matter of law where the facts are undisputed and "reasonable minds could not differ."[42] But proximate cause is usually the province of the jury because it involves determining what actually occurred.[43]

Smith's undisputed misrepresentation kept Dewar from knowing that Beddall had changed the return address and, thus, the refund recipient. Dewar's

---

[39] Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998).
[40] Michaels v. CH2M Hill, Inc., 171 Wn.2d 587, 609-10, 257 P.3d 532 (2011).
[41] Michaels, 171 Wn.2d at 611.
[42] Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999); Schooley, 134 Wn.2d at 478; Brust v. Newton, 70 Wn. App. 286, 291-92, 852 P.2d 1092 (1993).
[43] Michaels, 171 Wn.2d at 610; Brust, 70 Wn. App. at 291-92.

injury is not in dispute. But we cannot say as a matter of law that without Smith's misrepresentation, Dewar would have avoided those damages.

Correct information from Smith—either a "noisy withdrawal" or notice to Dewar that Beddall had revoked his authority to disclose—should have alerted Dewar that he needed to act to protect his interests. He could have demanded information from Beddall or sought to enforce the settlement agreement in court. But, as the taxpayer, Beddall had the authority to amend his own tax return or revoke Hatch's power of attorney[44] and direct the delivery of his refund. At the time of Smith's misrepresentation, Beddall lived in Thailand. In short, Dewar has not yet presented evidence, much less undisputed evidence, that Smith's exercise of reasonable care would have allowed Dewar to prevent delivery of the refund to Beddall. The trial court erred when it resolved the issue of proximate cause in fact on summary judgment.

The trial court also determined on summary judgment the amount of damages caused by Smith's negligent misrepresentation, $1,375,930.96. The record does not support this decision. Beddall's August 16, 2010, e-mail to Dewar included an offer to give him $500,000.00 of the refund. Therefore, the record contains some evidence that Dewar failed to mitigate his damages.

---

[44] 26 C.F.R. § 601.505(a)(2) (1992).

Smith argues that the trial court's damages ruling was wrong for two additional reasons. First, he contends that because Beddall's losses for tax purposes didn't occur until 2010, when he transferred the Lea Hill property to Dewar, Beddall could not claim these losses on his 2009 tax return. Therefore, he argues, Dewar's damages are illusory. We reject this argument. Smith identifies no evidence in the record showing any IRS challenge to Beddall's 2009 return. And even if the IRS at some point attempted to recoup the refund as erroneous or fraudulent, it would pursue Beddall as the taxpayer, not Dewar.

Second, Smith argues that the settlement agreement is unenforceable because tax law does not permit the assignment of tax refunds. We disagree. Under federal law, a taxpayer may name a representative to sign a tax return or receive a refund.[45] On the version of the IRS Form 2848 that Beddall signed, the taxpayer had the option to initial a paragraph limiting the authority of the named representative "to receive, BUT NOT TO ENDORSE OR CASH, refund checks." Beddall did not initial this section to prevent Hatch from endorsing or cashing the refund checks. This was consistent with the settlement agreement, which provided that Hatch would "endorse and convert [the tax refund] to good and available funds" and "immediately disburse" it to Dewar. Federal law also

---

[45] 26 C.F.R. § 601.503, .504(a)(5), .506 (1992); IRS Form 2848, Power of Attorney and Declaration of Representative.

permits a representative named in a power of attorney to endorse tax refund checks.[46] The settlement agreement relied upon authorized procedures to accomplish a transfer of Beddall's refund to Dewar.

Although Smith fails to show that Dewar's damages are illusory, Dewar does not establish as a matter of law that Smith's misrepresentation proximately caused all of Dewar's claimed damages. The trial court erred in granting summary judgment on this issue.

Third-Party Beneficiary Contract

Finally, Smith argues that because Dewar was not intended to be a direct beneficiary of the engagement between Beddall and Smith, Dewar's claim for breach of a third-party beneficiary contract fails as a matter of law. Therefore, Smith asserts that the trial court erred in denying his motion for summary judgment on this claim. But the context of the contract between Beddall and Smith permits the inference that they both intended that contract to specifically benefit Dewar. This precludes summary judgment on this issue.

Dewar's Motion To Supplement the Record under RAP 9.11

Citing RAP 9.11,[47] Dewar seeks an order admitting a January 8, 2014, stipulation and agreed order between Kenneth Smith and the Washington State

---

[46] 31 C.F.R. § 240.13 (2004).
[47] RAP 9.11 allows the appellate court to admit additional evidence on the merits of a case under certain circumstances.

Board of Accountancy. We deny Dewar's motion. RAP 9.12 limits this court's review of a trial court order granting or denying summary judgment to evidence presented to the trial court. Because the trial court did not have the board's order, we cannot consider it on appeal. Our decision does not prevent Dewar from asking the trial court to consider this evidence and the legal theories it may support on remand.

## CONCLUSION

We affirm the trial court's ruling that Smith owed Dewar a duty of care and its denial of Smith's motion for summary judgment on contract claims. Because Dewar has not established that Smith's negligent misrepresentation proximately caused his damages or the amount of any damages, we reverse and remand for further proceedings consistent with this opinion.

_Leach, J._

WE CONCUR:

_Cox, J._

_Spearman, J._

-26-